## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| FERILYN SHI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. _____ |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| PROVIDENCE, LLC d/b/a | ) | |
| PROVIDENCE MEDICAL CENTER, *and* | ) | |
| PRIME HEALTHCARE SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

For her Complaint against Defendants Providence, LLC d/b/a Providence Medical Center ("Providence") and Prime Healthcare Services, Inc ("Prime") (collectively, "Defendants"), Plaintiff Ferilyn Shi ("Dr. Shi" or "Plaintiff") states and alleges as follows:

### I.    NATURE OF THE ACTION

1.    This is an action for employment discrimination brought to secure legal and equitable relief for injuries sustained by Plaintiff as a result of Defendants' discrimination in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq.* ("Title VII") for gender, racial, and national origin discrimination, and Defendants' violations of the Equal Pay Act of 1963, 29 U.S.C. § 206, *et seq.*

2.    Defendants, by and through their employees, officers, and agents, unlawfully discriminated and retaliated against Plaintiff based on her gender, race, color, and national origin, creating an intimidating, offensive, and hostile work environment that affected the terms and conditions of Plaintiff's employment.

3.    Plaintiff seeks compensatory damages, punitive damages, liquidated damages, and reasonable attorneys' fees and costs as remedies for Defendants' violation of her rights.

## II.      PARTIES

4.      Dr. Shi is a citizen of Kansas, who worked as a board-certified Neurologist at Providence Medical Center from approximately October 2011 until August 2020.

5.      Providence is a Delaware limited liability corporation, which, upon information and belief, operates Providence Medical Center, a hospital in Kansas City, Kansas.

6.      Prime is a Delaware corporation with its principal place of business located at 3480 East Gausti Road, Ontario, California.

7.      Defendants are businesses and can act only through their officers and employees, and the conduct of an officer or employee acting within the scope of his or her employment or authority is the conduct of the companies.

## III.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Plaintiff's federal claims – Counts I through IV - pursuant to 28 U.S.C. § 1331.

9.      This Court has supplemental jurisdiction over Plaintiff's remaining claims – Count V - because that claim relates to the Counts over which the Court has original federal question jurisdiction.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) since Defendants are subject to this Court's personal jurisdiction by maintaining facilities and business operations in this District, and the events and unlawful employment practices giving rise to this action occurred in this District.

## IV.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

11.     Plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. § 2000e-5(b) on March 8, 2021, a

copy of which is attached hereto as Exhibit 1.

12.     On or around June 29, 2021, the EEOC issued Plaintiff a Notice of Right to Sue, a copy of which is attached hereto as Exhibit 2.

13.     Plaintiff has complied with all administrative prerequisites to bringing this lawsuit and has timely filed this action.

## V.     ALLEGATIONS COMMON TO ALL COUNTS

### a.  Dr. Shi is a highly qualified and high performing neurologist.

14.     Dr. Shi is a Chinese American woman and physician.

15.     Dr. Shi received her medical degree from Kunming Medical University in 1975. She then received a second medical degree from Hunan Medical University in 1984.

16.     Dr. Shi also received post-graduate medical education from the University of Texas, the University of Kansas School of Medicine, and the University of Chicago.

17.     Dr. Shi began working as a neurologist at Providence in Kansas City, Kansas, on or about October 3, 2011.

18.     Dr. Shi was responsible for seeing patients suffering from a variety of neurological conditions, diseases, and disorders.

19.     On or about June 20, 2018, Dr. Shi received a Certificate of Excellence from Prime to honor her outstanding work performance and her reputation for "going above and beyond" in patient service.

20.     Dr. Shi also frequently received compliments and heartfelt thanks from her patients for the high-quality treatment she provided them.

21.     Further, Dr. Shi received five-star performance reviews from her colleagues, most recently in 2020.

22.     Dr. Shi's job performance consistently ranked above the 90th percentile when compared with other general neurologists nationwide.

23.     In addition to these performance accolades, Dr. Shi has conducted clinical research and participated in numerous medical trials.

24.     Dr. Shi has also been credited with a total of sixty-five (65) medical publications, presentations, and posts, and she has authored writings in several peer-reviewed medical journals, including Stroke, Mayo Clinic, and others.

25.     In or around December 2011, another neurologist, a white male, was hired by the hospital.

26.     From this point on, Dr. Shi and this new neurologist were the only two neurologists responsible for treating thousands of neurological patients each year.

27.     Dr. Shi was at least an equal to her white male counterpart in the following important categories: education, experience, qualifications, workload, and patient care responsibility. The two neurologists were even assigned the same on-call schedule.

28.     Dr. Shi's productivity as a physician was compared to comparable physicians using relative value units (RVUs).

29.     Dr. Shi's RVUs exceeded those of her white male counterpart in multiple years that they were coworkers.

30.     Despite her exemplary performance, Dr. Shi's last raise or bonus was given to her in 2014, whereas, upon information and belief, her white male counterpart was given multiple bonuses or raises.

31.     When Dr. Shi's contract expired in August 2020, her annual salary was $40,000 less than her white male counterpart's.

4

b.  **Dr. Shi experienced openly hostile treatment after the onset of COVID-19.**

32.     Between the months of January through March 2020, the COVID-19 pandemic became a more and more pressing threat to hospitals throughout the United States, and in March 2020, Providence was experiencing an elevated number of patients with symptoms consistent with COVID-19.

33.     In or around early March 2020, Dr. Shi repeatedly asked Providence to test patients with COVID-19 symptoms but the hospital refused her requests.

34.     Dr. Shi repeatedly ordered COVID-19 tests for patients experiencing these symptoms, but her orders were canceled per the hospital's policy. Patients died one after another on a near daily basis during this time.

35.     Throughout March and April 2020, Dr. Shi complained about the hospital's irresponsible and careless handling of the COVID-19 pandemic and continued requesting tests to facilitate the diagnosis and treatment of COVID-19 patients. The hospital again rejected Dr. Shi's requests.

36.     After repeated requests and telephone calls, the hospital finally allowed a patient to be tested for COVID-19 on March 11, 2020. The patient passed away and tested positive for COVID-19 shortly thereafter. Upon information and belief, this was the first reported COVID-19 death in the state of Kansas.

37.     In April 2020, Dr. Shi continued to complain about the hospital's refusal to treat some patients suffering from COVID-19.

38.     Dr. Shi also expressed concerns regarding the hospital's non-compliance with OSHA requirements and CDC guidelines. Specifically, Providence failed to keep pace with advances in medicine and instead used outdated, unsafe, and invasive methods, including a

method known as "mouth-checking", forcing hundreds of patients and employees to remove their facemasks to undergo mouth manipulation for temperature-checking.

39.     These methods were conducted at hospital entrances, including the emergency room entrance, which increased the risk of COVID-19 exposure in Wyandotte County (an area with the highest COVID-19 mortality rate in the state of Kansas for a long period of time).

40.     Further, Dr. Shi was given only one facemask to be worn for an entire week.

41.     Upon information and belief, other physicians were given facemasks every day (or at least several per week).

42.     After repeated use, Dr. Shi's facemask became spoiled and she began to experience symptoms of shortness of breath, chills, sore throat, nasal congestion, headaches, fatigue, generalized weakness, eye pain, sclera blisters, and other symptoms.

43.     On April 5, 2020, Dr. Shi emailed the Director of Physician Services, Mr. Patrick Dickes, ("Dickes") requesting adequate personal protective equipment for the treatment of COVID-19 patients.

44.     Dickes did not respond to Dr. Shi's request or otherwise address the problem. As a result, Dr. Shi was frequently ill and had to use her vacation time to rest for two weeks near the end of April 2020.

45.     In or around March 2020, Dr. Shi counselled the hospital's chief nursing officer, Jennifer Cannon to ensure that she was wearing a face mask to prevent against the spread of COVID-19 at all times when around patients and other staff.

46.     Immediately following this, Dr. Shi began to receive discriminatory treatment from Cannon, who would give Dr. Shi dirty looks and ignored Dr. Shi when she greeted her.

47.     Dr. Shi believes this hostile treatment was motivated by the nursing administrator's prejudice against Chinese Americans related to the COVID-19 pandemic as well as Dr. Shi's complaints regarding the hospital's inadequate COVID-19 preparedness.

**c.  Dr. Shi was singled out and forcibly removed from work because she is an Asian American woman who opposed Providence's handling of the COVID-19 pandemic.**

48.     On May 12, 2020, Dr. Shi entered the hospital's emergency room to begin her shift. A temperature checkpoint had been installed at the emergency room's entrance, which was in a heavily contaminated COVID-19 patient care area.

49.     Dr. Shi passed through the checkpoint and was cleared to begin work. She was also given a sticker to signify that she had successfully passed through the checkpoint.

50.     After Dr. Shi had been working for over an hour, an announcement was sent out over the hospital's speaker system instructing her individually to return to the emergency room's temperature checkpoint.

51.     When Dr. Shi returned to the emergency room checkpoint, she asked why she had been instructed to return. Dr. Shi was told to remove her mask so that a hospital staff member could perform an additional "mouth check."

52.     Dr. Shi advised that her temperature had already been checked and showed the nursing staff member the sticker indicating that she had successfully cleared the checkpoint. She also proposed less invasive methods for checking her temperature and advised that forcing her to remove her mask in a COVID-19 patient care area would violate OSHA requirements and CDC guidelines. Dr. Shi even suggested that the mouth check be performed in an area less contaminated with COVID-19 if the staff insisted on checking her mouth.

53.     At this point, a nursing staff member, Katrina L/N/U, ignored Dr. Shi's comments and proceeded to attempt to forcibly remove her facemask.

54.     Additionally, another member of the nursing staff threatened Dr. Shi's employment in the presence of patients in the emergency room.

55.     These hospital staff members rejected Dr. Shi's offers of alternative methods for checking her mouth and requested that security forcibly remove her from the hospital.

56.     Dr. Shi advised that she needed to find a physician to cover her shift to ensure adequate treatment for her patients in her absence. Hospital staff, however, refused to allow her time to make these arrangements.

57.     Specifically, Dr. Shi asked hospital staff to allow her time to place physician orders for diagnostic tests, medications, and treatment for patients in the hospital; to check the test results of her clinical patients; to allow her to communicate with other physicians about patient care; to allow her time to sign out patients to other physicians; and finally, to allow her time to speak with management-level employees. Defendants refused each request.

58.     As Dr. Shi was being escorted from the hospital, she noticed Dickes sitting in the physicians' lounge. This was very unusual as Dickes was rarely seen in this part of the hospital.

59.     Upon information and belief, Dickes was in the physician lounge to observe Dr. Shi's second temperature check and subsequent forced removal from the hospital.

60.     Dr. Shi took this opportunity to voice her concerns directly to Dickes regarding why she had been forced to return to the checkpoint, why she was being paid significantly less than her white male counterpart, and why she was being treated differently from the other physicians.

61.     Dr. Shi also complained at this time about the national origin, racial, gender, and salary discrimination she had experienced. In particular, she complained that she had faced discrimination as a Chinese American during the COVID-19 pandemic.

62.    After this incident, Dr. Shi emailed Dickes to complain that the incident involving the temperature checkpoint had caused her severe physical and psychological distress, including dangerously elevated blood pressure, severe headaches, blurred vision, lost vision in her right eye for several hours, dizziness, unsteadiness, shortness of breath, nausea, and generalized weakness.

63.    On May 13, 2020, Dr. Shi raised her concerns regarding patient care and patient safety to Dickes, who took no action.

64.    On May 14, 2020, Dr. Shi received an email from Dickes informing her that she had been placed on investigative leave and instructing her not to return to the hospital for any reason pending the outcome of an investigation by Providence.

65.    Prime, Dr. Shi's work provided health insurance provider, would only provide coverage for visits to physicians that worked at Providence.

66.    Because the terms of her investigative leave prevented her from visiting Providence's premises for any reason, Dr. Shi was not permitted to receive treatment for any of the physical and psychological problems she experienced as a result of the May 12, 2020, incident.

67.    Dr. Shi was also barred from returning to the hospital to retrieve her medical records, dental records, sensitive financial documents, and other personal belongings.

68.    On May 22, 2020, Dr. Shi asked Dickes to send her a copy of the hospital's policies regarding temperature checking through mouth checks. Dr. Shi also asked Dickes if the hospital had any policies or procedures in place that would require the removal of a facemask in a heavily contaminated COVID-19 hospital setting.

69.    Dr. Shi also asked whether the hospital had implemented any policies that would

require a physician to be expelled from the facility for raising concerns about removing her facemask in an area where patients were receiving treatment for COVID-19.

70.     The same day, Dr. Shi asked Dickes to provide her with a copy of the investigation the hospital had conducted against her, but Dickes never replied.

71.     In July 2020, Dr. Shi requested several times to be allowed to return to work, but Providence refused.

72.     Later that month, Dr. Shi was told that her employment contract—which officially expired on August 27, 2020—would not be renewed.

73.     At the time she was terminated, Dr. Shi was being paid $360,000 per year, approximately $40,000 less than her white male counterpart.

74.     At this time, Dr. Shi was the only Chinese American physician employed by the hospital.

75.     After repeated requests made with the assistance of counsel, Dr. Shi was finally allowed to return to the hospital to undergo diagnostic testing in July 2020. While being seen as a patient, Dr. Shi received warnings from Prime threatening that she would again be removed from the hospital by security if she spoke to any person while visiting the facility.

76.     On or about August 20, 2020, Dr. Shi was being seen as a patient at Providence for medical testing. During this visit, Dickes continuously monitored and followed Dr. Shi.

77.     Eventually, Dickes approached Dr. Shi to inquire as to why she was located on Providence's premises.

78.     When Dickes approached her, Dr. Shi asked for a copy of the hospital's investigation, but he refused to provide it. She asked for a copy of the hospital's policies regarding mouth manipulation and termination of a physician for wearing a facemask, and he

responded that no such policies existed. Dr. Shi asked Dickes why she was not being permitted to return to work, and he said that was not his decision.

79.    On August 24, 2020, Dr. Shi was finally allowed to go to her office during evening hours to retrieve her personal belongings.

80.    Dr. Shi was treated with extreme hostility during this visit. A hospital administrator read and checked every single page of the documents Dr. Shi attempted to take with her, including her personal confidential records. Besides a few books and journals, the hospital retained all of Dr. Shi's personal records—including her medical and financial records, personal intellectual documents, and handwritten research notes—despite her repeated requests for the return of these documents.

81.    Upon information and belief, Providence and Prime discriminated against Dr. Shi based upon her status as a Chinese American woman and that the racial and national origin discrimination she experienced worsened during the pandemic due to a false connection that some people draw between COVID-19 and Asian Americans.

82.    Upon information and belief, Defendants' improper actions on May 12, 2020, were motivated by her gender, race, color, national origin, and repeated complaints regarding Defendants' failure to safeguard its patients and employees alike regarding the dangers of COVID-19. No other physician to Dr. Shi's knowledge was forced to return to the temperature checkpoint. Further, other physicians were permitted to undergo less invasive temperature checking upon request (including forehead scanning and armpit checking).

83.    Upon information and belief, the hospital created this upsetting and humiliating incident to manufacture pretextual grounds for removing her from the hospital.

84.    Upon information and belief, Defendants' decision to pay her significantly less

than her white male counterpart neurologist was motivated by her race, color, national origin, and sex. No legitimate reason existed for this disparate treatment – Dr. Shi held at least equal qualifications, educational credentials, workload, and patient responsibility to her white male counterpart.

85.     Upon information and belief, Defendants' decision not to renew her contract when it expired on August 27, 2020 was motivated by Dr. Shi's race, color, national origin, and sex. Dr. Shi was the only Chinese American physician in the hospital's employ. Her job performance was exemplary, and no legitimate reason existed for declining to renew her employment.

86.     Upon information and belief, Defendants' decision not to renew Dr. Shi's employment contract was made in retaliation for complaints she made regarding the hospital's irresponsible handling of the COVID-19 pandemic and her discriminatory pay.

## VI.     CLAIMS FOR RELIEF

### COUNT I

**Race, Color, and National Origin Discrimination in Violation of
Title VII of the Civil Rights Act of 1964,** *as amended***, 42 U.S.C. § 2000e ("Title VII")**

87.     Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

88.     Plaintiff is of Chinese national origin and her race is Asian-American. Thus, she is a member of a protected class within the meaning of Title VII.

89.     Defendants are covered entities and employers as defined in Title VII in that they are engaged in an industry affecting commerce that has fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding year.

90.     Plaintiff is a Chinese American physician, who was treated less favorably than

one or more of her white counterparts.

91.     Plaintiff's race, color, and national origin motivated Defendants' discriminatory actions, inactions, decisions, and/or other conduct alleged herein as set forth in this Complaint.

92.     Defendants' discriminatory actions, inactions, decisions, and conduct affected the compensation, terms, conditions, and/or privileges of Plaintiff's employment as described herein.

93.     Defendants' discriminatory actions, inactions, decisions, and other conduct alleged herein deprived Plaintiff of employment opportunities or otherwise adversely affected her status as an employee.

94.     Defendants' actions, inactions, decisions, non-renewal of Plaintiff's employment contract, and conduct constituted unlawful employment discrimination against Plaintiff in violation of Title VII.

95.     Defendants' actions and/or inactions subjected Plaintiff to terms, conditions, and/or privileges of continued employment that were different and less favorable than the terms, conditions, and/or privileges of employment to which similarly situated non-Chinese and non-Asian employees were subjected.

96.     Defendants' actions and inactions occurred by and through their agents, servants, and/or employees acting within the course and scope of their employment.

97.     After being notified of the discriminatory, hostile, and offensive conduct to which Plaintiff had been subjected, Defendants failed to exercise reasonable care to prevent and promptly correct the above-described racially discriminatory behavior.

98.     As shown by the foregoing, Plaintiff suffered intentional discrimination at the hands of Defendants' employees during her employment based on her race, color, and national origin, in violation of Title VII.

99.     As a direct and proximate result of Defendants' actions and/or inactions, including their decision not to renew her contract, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

100.     As a further direct and proximate result of Defendants' actions and/or inactions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, and related compensatory damages.

101.     Defendants failed to make good faith efforts to establish and enforce policies to prevent illegal discrimination against its employees, including racial and national origin discrimination and harassment.

102.     Defendants failed to properly train and/or otherwise inform their employees concerning their duties and obligations under Title VII.

103.     Defendants subjected Plaintiff to disparate treatment, racial and national origin discrimination, and maintained or allowed to exist a work environment overrun by racial antagonism.

104.     As shown by the foregoing, Defendants engaged in these discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights. Plaintiff is therefore entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter them and others from engaging in similar conduct in the future.

105.     Plaintiff is entitled to an award of her reasonable attorneys' fees as provided in Section 706(k) of Title VII, 42 U.S.C. § 2000e-5(k).

WHERFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendants for such damages, actual and punitive, as are fair and reasonable, including back pay and front pay and compensatory damages, for her reasonable attorneys' fees and costs incurred

herein, for interest allowed by law, and for such other and further relief as the Court may deem just and equitable.

## COUNT II

### Gender Discrimination in Violation of
### Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e ("Title VII")

106.    Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

107.    Plaintiff, who is female, is a member of a protected class within the meaning of Title VII.

108.    Defendants are covered entities and employers as defined in Title VII in that they are engaged in an industry affecting commerce that has fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

109.    Plaintiff is a female who was treated less favorably than one or more of her male counterparts.

110.    Plaintiff's gender was a factor in Defendants' discriminatory actions, inactions, decisions, and/or other conduct alleged herein as set forth in this Complaint.

111.    Defendants' discriminatory actions, inactions, decisions, non-renewal of Plaintiff's employment contract, and/or conduct alleged herein affected the compensation, terms, conditions, and/or privileges of Plaintiff's employment as described herein.

112.    Defendants' actions and/or inactions deprived Plaintiff of employment opportunities or otherwise adversely affected her status as an employee because of her gender.

113.    Defendants' actions and/or inactions constituted unlawful employment discrimination against Plaintiff in violation of Title VII.

114.   Defendants' actions and/or inactions occurred by and/or through their agents, servants, and/or employees acting within the course and scope of their employment.

115.   After being notified of the discriminatory, hostile, and offensive conduct to which Plaintiff had been subjected, Defendants failed to exercise reasonable care to prevent and promptly correct the above-described gender-motivated discriminatory behavior.

116.   As shown by the foregoing, Plaintiff suffered intentional discrimination at the hands of Defendants' employees during her employment based on her sex in violation of Title VII.

117.   As a direct and proximate result of Defendants' actions and/or inactions, including their decision not to renew her contract, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

118.   As a further direct and proximate result of Defendants' actions and/or inactions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, and related compensatory damages.

119.   Defendants failed to make good faith efforts to establish and enforce policies to prevent illegal discrimination against its employees, including gender and sex discrimination and harassment.

120.   Defendants failed to properly train and/or otherwise inform their employees concerning their duties and obligations under Title VII.

121.   Defendants subjected Plaintiff to disparate treatment based upon her gender and sex.

122.   As shown by the foregoing, Defendants engaged in these discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights. Plaintiff is

therefore entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter them and others from engaging in similar conduct in the future.

123.   Plaintiff is entitled to an award of her reasonable attorneys' fees as provided in Section 706(k) of Title VII, 42 U.S.C. § 2000e-5(k).

WHERFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendants for such damages, actual and punitive, as are fair and reasonable, including back pay and front pay and compensatory damages, for her reasonable attorneys' fees and costs incurred herein, for interest allowed by law, and for such other and further relief as the Court may deem just and equitable.

## COUNT III

### Violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1)

124.   Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

125.   Defendants intentionally discriminated against Plaintiff on the basis of her sex by paying her a lower salary than they paid her white male counterpart neurologist.

126.   Plaintiff was one of two neurologists employed by the hospital during the relevant time period, including at the time of her termination. She was performing work which was substantially equal to that of the white male neurologist in the hospital's employ when considering the skills, duties, supervision, effort, and responsibilities of the respective positions.

127.   The conditions governing Plaintiff's work and her white male counterpart's work were substantially similar, if not identical, throughout the relevant time period, ending at the time of her termination.

128.   Specifically, Plaintiff was at least as qualified as her white male counterpart in

the following important categories: education, experience, qualifications, workload, and patient care responsibility. The two neurologists were even assigned the same on-call schedule.

129.     Yet, Defendants paid Plaintiff substantially less than her white male counterpart throughout the relevant time period, ending at the time of her termination.

130.     Additionally, Defendants awarded her white male counterpart significant bonuses and raises while withholding the same from Plaintiff.

131.     As a direct and proximate result of Defendants' discriminatory pay practices, Plaintiff lost compensation that she was lawfully owed.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendants for such damages, actual and punitive, as are fair and reasonable, including back pay and front pay and compensatory damages, for her reasonable attorneys' fees and costs incurred herein, for interest allowed by law, and for such other and further relief as the Court may deem just and equitable.

## COUNT IV

**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e-3(a)**

132.     Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

133.     Defendants engaged in protected activity by reporting the discriminatory treatment she received to the hospital's Director.

134.     Specifically, Plaintiff expressed concerns that she was being treated differently than her co-workers based on her sex, her race, and her national origin when she questioned why she was being paid significantly less than her white male counterpart; and why she was being treated differently from the other physicians.

135.    On May 14, 2020, soon after reporting her concerns of discrimination to Dickes, Plaintiff received an email from Dickes informing her that she had been placed on investigative leave and instructing her not to return to the hospital for any reason pending the outcome of an investigation by Providence.

136.    Plaintiff was subsequently prohibited from returning to the hospital to retrieve her sensitive personal belongings or to receive medical treatment.

137.    Plaintiff was then informed in July 2020 that her employment contract would not be renewed.

138.    Plaintiff was illegally retaliated against for participating in the protected activity of opposing discrimination by Defendants who took materially adverse actions against her as a direct result of her challenge to the discrimination.

139.    Defendants' adverse actions constitute retaliation, and its actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

140.    There was a direct causal link between Plaintiff's report of the hostile, offensive, and discriminatory treatment she received from the hospital and its employees and the adverse employment actions taken by the hospital against Plaintiff.

141.    As a direct, legal, and proximate result of this retaliation, Plaintiff has sustained, and will continue to sustain, economic and emotional damages in an amount subject to proof at trial.

142.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from retaliation and discriminatory treatment.

WHERFORE, Plaintiff requests that the Court enter judgment in her favor and against

Defendants for such damages, actual and punitive, as are fair and reasonable, including back pay and front pay and compensatory damages, for her reasonable attorneys' fees and costs incurred herein, for interest allowed by law, and for such other and further relief as the Court may deem just and equitable.

## COUNT V

### Wrongful Termination in Violation of Kansas Public Policy

143.    Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

144.    Under the whistleblower public policy exception to the at-will employment doctrine, termination of an employee, in retaliation for good faith reporting of a co-worker's or employer's serious infraction of rules, regulations, or law pertaining to public health, safety, and general welfare, is an actionable tort.

145.    Plaintiff made repeated good faith reports of acts, conduct, and practices engaged in by Defendants with regard to its response to the COVID-19 pandemic, which she reasonably and in good faith believed were unlawful, unsafe, and improper and involved conduct pertaining to the public health, safety, and welfare and that of his colleagues.

146.    Specifically, Plaintiff complained about the hospital's provision of inadequate PPE during the COVID-19 pandemic and other facets of its pandemic preparedness.

147.    On April 5, 2020, Dr. Shi emailed Dickes asking for adequate personal protective equipment for the treatment of COVID-19 patients. Plaintiff was given only one facemask to be worn for an entire week, but other physicians were given facemasks every day (or at least several per week). After repeated use, Plaintiff's facemask became spoiled and she began to experience symptoms of shortness of breath, chills, sore throat, nasal congestion, headaches, fatigue,

generalized weakness, eye pain, sclera blisters, and other symptoms. However, Dickes did not respond to Plaintiff's request or otherwise address the problem. As a result, Plaintiff was frequently ill and had to use her vacation time to rest for two weeks near the end of April 2020.

148.   The hospital's provision of inadequate and unsanitary PPE was in violation of 29 C.F.R. § 1910.132, which states (in relevant part) as follows:

> *Application.* Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact.

> *Employee-owned equipment.* Where employees provide their own protective equipment, the employer shall be responsible to assure its adequacy, including proper maintenance, and sanitation of such equipment.

149.   Defendants had knowledge of Plaintiff's reporting prior to placing her on investigative leave and terminating her.

150.   After making these reports or engaging in this protected activity, Plaintiff was unlawfully discriminated and retaliated against by Defendants when they placed her on investigative leave, banned her from visiting her place of work, and ultimately, terminated her employment.

151.   Defendants' treatment and termination of Plaintiff was outrageous and carried out willfully, wantonly, and maliciously.

152.   As a direct and proximate result of the unlawful acts and conduct of Defendants, as described in part herein, by and through and in concert with its employees and agents, Plaintiff has suffered pecuniary and non-pecuniary damages, including lost wages and benefits, out of

pocket expenses, interest, mental and emotional distress, and reasonable attorneys' fees in an amount subject to proof at trial.

WHERFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendants for such damages, actual and punitive, as are fair and reasonable, including back pay and front pay and compensatory damages, for her reasonable attorneys' fees and costs incurred herein, for interest allowed by law, and for such other and further relief as the Court may deem just and equitable.

## VII.   PLAINTIFF'S DEMAND FOR JURY TRIAL

Plaintiff hereby requests and demands a trial by jury on all issues so triable.

## VIII.   DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates Kansas City, Kansas as the place of trial in this matter.

Dated: September 24, 2021                    Respectfully submitted,

|  | MCINNES LAW LLC<br>By:  _/s/ Jack McInnes_<br>Jack D. McInnes (KS #21898)<br>Austin O. Jaspers (KS #28313)<br>1900 West 75th Street, Suite 220<br>Prairie Village, Kansas 66208<br>Telephone: (913) 220-2488<br>Facsimile: (913) 347-7333<br>jack@mcinnes-law.com<br>austin@mcinnes-law.com<br><br>ATTORNEY FOR PLAINTIFF |
| --- | --- |